BLACK & VEATCH INTERNATIONAL
COMPANY, Plaintiff,

v.

FOSTER WHEELER ENERGY
CORPORATION,
Defendant.

No. 00–2402–JAR.

United States District Court,
D. Kansas.

Dec. 3, 2002.

about lost time or resources caused by the re-    moval of this case and the subsequent filings.

Dennis R. Schapker, Black & Veatch Corp., Overland Park, KS, Paul Odum, Husch & Eppenberger, Kansas City, MO, Kent P. Smith, George D. Wenick, William L. Baggett, Jr., Smith, Currie & Hancock, LLP, Atlanta, GA, for Plaintiff.

Leonard J. Johnson, Stinson, Morrison, Hecker, LLP, Kansas City, MO, Ira Genberg, Robert P. Brown, Justin S. Scott, David A. Handley, Smith, Gambrell & Russell, LLP, Atlanta, GA, for Defendant.

## ORDER ON MOTION FOR SANCTIONS

ROBINSON, District Judge.

This action arises out of the construction of the Hanfeng Power Plant, Units 1 and 2 (Project) in the Peoples Republic of China. Plaintiff Black & Veatch International Company (Black & Veatch) contracted with Defendant Foster Wheeler Energy Corporation (Foster Wheeler) to design, supply and fabricate structural steel for the Project, in exchange for payment of $20,990,657. This matter comes before the Court pursuant to Foster Wheeler's Motion for Sanctions Against Plaintiff and for an Award of Costs and Attorneys' Fees to Defendant (Doc. 204). The motion requests the imposition of sanctions, including costs and fees, due to Black & Veatch's bad faith failure to comply with Judge Waxse's May 2, 2002 Memorandum and Order (Court Order), and due to Black & Veatch's bad faith failure to comply with the discovery obligations imposed by the Federal Rules of Civil Procedure. The motion seeks sanctions in the form of: dismissing with prejudice all of Black & Veatch's claims in excess of the contract price (over $1.4 million);[1] judgment for Foster Wheeler on its counterclaim ($488,854); and reasonable costs and fees incurred by Foster Wheeler.

The Court Order sets forth the facts leading up to this dispute. The Court will not repeat those facts and will only address the dispute from that point forward.[2] At the heart of the dispute are design calculations utilized by Black & Veatch at the time it made purchases (mill orders) of structural steel for a power plant in China.[3] Judge

---

1. Foster Wheeler refers to "Black & Veatch's PAL Claim for Extra Compensation." This is Black & Veatch's claim for recovery of an amount in excess of the lump sum contract price as compensation for extra work allegedly performed by Black & Veatch due to design revisions made by Foster Wheeler after Black & Veatch had mill ordered or purchased structural steel for the Hanfeng Project. PAL stands for "Problem Area List."

2. The parties argue regarding spoilation of Black & Veatch's original, interim design calculations. Foster Wheeler's attempts to "recreate" that evidence forms the basis for the dispute before Judge Waxse and now before this Court. At this late date, the Court will not revisit whether the evidence should have been retained in the first place. The parties also spend considerable time arguing about the relevance of items requested and about what was requested pursuant to earlier discovery requests. To the extent that the Court Order addresses these issues and is the last word on what was required of the parties, the Court will not revisit these issues.

3. Black & Veatch used its Power Plant Analysis and Design. Structural (PPADS) computer program to design the structural steel for the Project. The PPADS program runs on a mainframe computer and maintains a database of files. The program draws on its database to produce reports that provide design calculations, drawings and other information associated with the design.

Waxse found that these interim design calculations were within the scope of Foster Wheeler's discovery request, and the fact that they did not exist in their original form and must be recreated did not take such calculations outside the scope of the request. Judge Waxse also found that Foster Wheeler's need for the materials requested outweighed any projected burden on Black & Veatch, and ordered that:

(1) Plaintiff shall produce CDs containing the *actual* creation/modification dates of each of the Input Files;

(2) Plaintiff shall produce the information necessary for Defendant experts to run the Input Files on the VAX and/or UNIX in order to recreate specific design calculations existing at the time of Plaintiff's mill order;

(3) Plaintiff shall cooperate with Defendant in Defendant's efforts to accomplish the task set forth in subsection (2) above; and

(4) The deadline before which Defendant shall designate its structural steel experts is hereby reset to *August 1, 2002.*

. . . .

(1) Both parties shall keep accurate records regarding the time and costs associated with the tasks set forth in (1), (2), and (3) above and, if after such tasks are accomplished, the parties are unable to come to an agreement regarding allocation of such costs in terms of time and money, the parties shall file the appropriate motion; and

(2) Plaintiff and Defendant shall each pay their own costs and expenses, including attorney and expert witness fees, incurred with respect to briefing the Motion.

The Court Order makes clear that Black & Veatch is required to actively participate, jointly with Foster Wheeler, in carrying out the necessary steps to recreate the design calculations in question. The Court Order also makes clear that Black & Veatch's cooperation must be given in a timely manner in order to permit both recreation of the design calculations and analysis of the same by Foster Wheeler's experts prior to the August 1, 2002 deadline. In addition, the Court Order imposes on both parties a mutual interest in accomplishing the recreation of the design calculations in the most cost effective manner by providing that the costs incurred by both parties will be allocated between the parties by the Court, if the parties "are unable to come to an agreement regarding allocation of such costs."

The Court will only address the allegations that involve potentially sanctionable conduct. The Court will address whether Black & Veatch failed to cooperate with Foster Wheeler as required by the Court Order: 1) by failing to provide personnel/hardware; 2) by refusing to give assurances requested by Foster Wheeler; 3) by providing Foster Wheeler with an incompatible CD; 4) by delaying its production of documents; 5) by delaying its response to questions in the June 11, 2002 letter; and 6) by making misrepresentations to Foster Wheeler.

### 1. Failure to Provide Personnel/Hardware:

The Court Order partially granted and partially denied Foster Wheeler's motion to compel (Docs. 67 and 75). In the motion to compel, Foster Wheeler sought an order requiring, among other things, that Black & Veatch fully cooperate with Foster Wheeler's engineering and/or computer experts' inspections and use of Black & Veatch's computer hardware, software and related technical documents as Foster Wheeler's experts deemed appropriate to run all Input Files necessary to obtain/or recreate the specific design calculations on the UNIX Platform and/or VAX Platform belonging to Black & Veatch. Because use of Black & Veatch's hardware was requested, and not granted, the Court finds that Black & Veatch did not violate the Court Order by refusing such request. And, use of Black & Veatch's engineers was neither requested nor ordered.

■ However, Black & Veatch was required to cooperate with Foster Wheeler in its efforts to run the Input Files on the VAX and/or UNIX in order to recreate specific design calculations existing at the time of Black & Veatch's mill orders. Black &

Veatch argues that recreation of the design calculations "is not really feasible because the cost would be out of proportion to the PAL claims."[4] The Court Order addressed this very issue, finding that the need for the materials requested outweighed any projected burden on Black & Veatch. Black & Veatch argues that Judge Waxse was misinformed of the cost involved, noting that Judge Waxse apparently accepted Foster Wheeler's speculation that only 15–20 PPADS runs[5] would be needed, rather than the testimony of Black & Veatch's engineer that almost all the files would need to be rerun to get an accurate representation. Black & Veatch should have either informed Judge Waxse of this, or filed a motion to reconsider. The Court Order provides that "the party resisting discovery has the obligation to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure which would be required to produce the requested documents."[6] Thus, although Black & Veatch was not ordered to provide its hardware or engineers, it was required to cooperate with Foster Wheeler's efforts, whether it thought they were feasible or not.

## 2. Refusal to give Assurances Requested by Foster Wheeler:

Because Black & Veatch's PPADS programs are proprietary to Black & Veatch, and it has many years of experience using these programs, Black & Veatch is obviously in a position to know whether use of its UNIX PPADS program will produce the same results that it obtained on the Project using the VAX PPADS program. Foster Wheeler claims that the withholding of this information forced Foster Wheeler to use the VAX platform since it would have been unreasonable to spend time and money attempting to recreate design calculations on a UNIX platform in the absence of the requested assurance. But, Black and Veatch did not unreasonably withhold this information. In fact, it told Foster Wheeler to run the programs on a UNIX platform.

It is clear from Foster Wheeler's May 17, 2002 letter that its "understanding of the testimony in the case is that Black & Veatch's input files will have to be run on VAX computer hardware ... [which] is no longer readily available." In its response letter dated May 20, 2002, Black & Veatch states that its "understanding is that the input files provided to you previously will run on a UNIX system, and that UNIX systems are commercially available." In a letter dated May 21, 2002, Black & Veatch explains that the Hanfeng VAX files were converted to UNIX files and states that:

> I also explained to you in October that the input files "should run on the VAX-based PPADS program **and** the UNIX-based PPADS program, both of which you have." (emphasis in original). I was uncertain at that time whether we had provided you with the converted input files, so I enclosed with my October letter "a CD containing all 2,015 input files, which I have confirmed are indeed in the converted format. They should, therefore, run on both the VAX and the UNIX versions of the PPADS program." I now understand that the previously provided input files will likely run better on a UNIX machine, because of some minor syntax differences between the VAX-based PPADS and the UNIX-based PPADS. Please advise me of the results of your investigations into obtaining a UNIX machine.

In a letter dated May 21, 2002, Foster Wheeler refers to the forthcoming CD and seeks confirmation that:

> (b) Black & Veatch represents to Foster Wheeler that these input files are suitable for use on either a VAX computer platform or a UNIX computer platform;

> (c) you "now understand that [the input files to be produced by Black & Veatch this week] will likely run better on a UNIX machine, because of some minor syntax differences between the VAX-based PPADS and the UNIX-based PPADS."; and

---

4. *See* footnote 1.

5. *See* footnote 3.

6. May 2, 2002 Memorandum and Order, p. 5.

(d) Black & Veatch represents to Foster Wheeler that using the CD's to be produced by Black & Veatch to Foster Wheeler, the UNIX PPADS Program (Version # 7) previously produced to Foster Wheeler will provide output results which are identical to the output results which were obtained by Black & Veatch using the VAX PPADS Program (Version # 6) during the course of the Hanfeng Project.

In that letter, Foster Wheeler again expressed concern that according to Mr. Hakes' testimony, any recreation of the calculations would have to be done using the VAX computer platform.

Black & Veatch responds on May 22, 2002 by stating in reference to (b) and (c) that:

I am confused by these two comments because they are somewhat inconsistent. As I explained to you in my letter yesterday, the input files that Black & Veatch previously produced will run better on a UNIX machine, because they are UNIX files, and the UNIX-based PPADS differs slightly from the VAX-based PPADS. Thus, the previously produced input files will not run as well on a VAX machine, and you might, therefore, conclude that they are not "suitable" for use on a VAX computer.

In reference to (d), Black & Veatch states that:

My letter yesterday referred to the best program for running the input files previously produced, not to the CD with the actual creation/modification dates that Black & Veatch expects to produce this week. In addition, I leave to your consultants whether those input files will provide the output results that you seek.

In a letter dated May 29, 2002, Black & Veatch states that:

You cite Mr. Hakes' statement concerning the use of VAX files on a UNIX system, which is irrelevant to Foster Wheeler's situation. Black & Veatch did not previously produce VAX input files, then expect Foster Wheeler to run them on a UNIX system. Instead, Black & Veatch previ-

ously produced UNIX input files, which had been converted from VAX files. Those UNIX files will not merely run on a UNIX system, they will run better on a UNIX system than a VAX system, as I previously told you.

Black & Veatch argues that Foster Wheeler's apprehension about whether the UNIX program would produce the same results was unfounded, based on Foster Wheeler's misstatement of Mr. Hakes' testimony. He testified as follows:

[T]he UNIX version you have will not run the VAX files from PPADS Hanfeng project. *We have tried previous projects just to see if you could pull a VAX project in and run it in UNIX; we had no success.* So to my understanding of this, you would first have to run it on the VAX operating system to get input files from—the PPADS program has the ability and it stores in its database information for each file that updated the project database. It can re-create the program from the first run that was used to update the database files to the last run that completed the project for the overall design process.[7]

Black & Veatch argues that Foster Wheeler only quoted the underlined sentence from the above testimony to create the false impression that the UNIX version of PPADS will not successfully run UNIX files that had been converted from VAX files. Black & Veatch then submits an affidavit from Mr. Hakes, executed on July 17, 2002, which states that:

The sentence preceding the underlined sentence makes clear that I was not talking about whether the UNIX version of PPADS will run converted UNIX input files from the project. Instead, I was explaining that "the UNIX version ... will not run the VAX files from PPADS Hanfeng project." The VAX files must first be converted to UNIX files before they will run successfully on the UNIX version of the PPADS program.

Mr. Hakes also explains in the affidavit that he has been involved in various projects for which VAX input files had been converted to

---

7. Hakes Oct. 16–17, 2001 Dep. at p. 21, l. 24—p. 23, l. 12.

UNIX input files, and that, based on his experience:

> [O]nce they are converted, the UNIX input files run successfully on the UNIX version of PPADS. This was the reason for converting those files in the first place, i.e., so that they would run successfully on the UNIX version of PPADS.

■ The Court finds that although Black & Veatch was aware of Foster Wheeler's interpretation of Mr. Hakes' testimony, and somewhat delayed in clearing the matter up, it did attempt to provide prompt explanations. The fact that the matter was not cleared up until Mr. Hakes' July 17, 2002 affidavit is not due to Black & Veatch's bad faith, nor did it constitute a failure to cooperate as required by the Court Order.

In its May 21, 2002 letter, Foster Wheeler also asked Black & Veatch to provide specific information concerning the UNIX computer platform on which the CD's to be produced can be run. On May 22, 2002, Black & Veatch responded that it would:

> not respond to this request for information about Black & Veatch's UNIX computer, until you confirm in writing that Foster Wheeler has never before requested this information. If you believe otherwise, please direct me to the appropriate letter or discovery request. My reason for requiring such confirmation is that you are already seeking to blame Black & Veatch for not previously providing you with information that you did not previously request. . . .

In a May 29, 2002 letter, Black & Veatch provided the information and claims that "[n]o delay resulted and no time was lost, because I initiated the inquiry concerning that information when I first received your request, dated May 21, 2001." Although Black & Veatch should have responded in a more "cooperative" manner, the fact is that Black & Veatch, despite its response, did not delay in providing the information and Foster Wheeler was not prejudiced.

### 3. Providing an Incompatible CD:

■ Foster Wheeler alleges that Black & Veatch prevented Foster Wheeler's experts from using the VAX platform because the CD contained a file system that was not compatible with the VAX platform and VAX version of the PPADS Program used by Black & Veatch on the Project. By letter dated July 1, 2002, Foster Wheeler advised Black & Veatch that it could not extract the data from the CDs to use on the VAX computer. The letter requested Black & Veatch to immediately provide the information necessary to convert the data on the CDs to a compatible format. By letter dated July 8, 2002, Black & Veatch supplied the requested information concerning use of the CD, stating that Foster Wheeler's experts simply needed to transfer the files from the CD to a PC machine, and then to FTP (file transfer protocol) copy them, in binary mode, back to the VAX system. The July 8 letter also told Foster Wheeler to "[p]lease advise if they encounter any difficulty in following this procedure." The Court finds that Foster Wheeler has not shown any misconduct by Black & Veatch, and Black & Veatch did not unduly delay in getting this information to Foster Wheeler.

### 4. Delay in Production of Documents until June 28, 2002:

Foster Wheeler alleges that Black & Veatch delayed until June 28, 2002, production of approximately 1000 pages of documents concerning the VAX and UNIX versions of Black & Veatch's PPADS software. Foster Wheeler alleges that these documents should have been produced: on October 15, 2001 in response to Foster Wheeler's Third Request for Production; in response to Foster Wheeler's follow-up letter dated October 18, 2001; and in response to Foster Wheeler's letter request of June 6, 2002.

Black & Veatch alleges it produced most of the materials previously. Black & Veatch sent manuals to Foster Wheeler on October 15, 2001, which consisted of 1,074 pages in four volumes. On June 27, 2002, Black & Veatch transmitted via e-mail additional responsive documents, including documents concerning the PPADS user training manual, PowerPoint presentations, and certain devel-

oper documents.[8] On June 28, 2002, Black & Veatch produced to Foster Wheeler "various text files and PowerPoint presentations ... in response to paragraph 7 of [Foster Wheeler's] June 6, 2002 letter." Foster Wheeler has not shown any misconduct or a failure to cooperate by Black & Veatch with regard to production of these documents.

### 5. Delay in Responding to Questions in June 11, 2002 Letter:

■ In a letter dated June 11, 2002, Foster Wheeler pointed out numerous omissions, inaccuracies, conflicts and discrepancies in the information on the CD provided by Black & Veatch on May 28, 2002, and sought clarification. In a letter dated June 20, 2002, Foster Wheeler again sought clarification. After investigating the issues and ascertaining that no present employees of Black & Veatch could answer questions 4–12, on June 24, 2002, Black & Veatch responded to questions 1–3. On June 27, 2002, Black & Veatch transmitted Foster Wheeler's June 11 letter and related documents to the lead design engineer for the Project, who had left Black & Veatch's employ more than three years earlier. The former employee did not provide his responses until July 23, 2002. That same day, Black & Veatch forwarded the responses to Foster Wheeler. The Court finds that Black & Veatch did not unduly delay its response, in light of the fact that the responses had to be obtained from a previous employee over whom it had no control. Black & Veatch transmitted the responses the same day it received them.

### 6. Alleged Misrepresentations:

A. Foster Wheeler claims that Black & Veatch knowingly misrepresented that it had produced a CD to Foster Wheeler that contained *all* of the input files Black & Veatch had used to make design calculations for the Project. In fact, some of the input files produced were "restart" files. The originals of such files were not produced. This is evident in that Black & Veatch provided the input dates for all 2,015 input files, yet the earliest existing input files are dated November 14, 1997, two weeks after the first mill

order. In fact, the earliest input files state that they were "restart" files.

Black & Veatch acknowledges that project teams routinely restart or recreate their design models, and the earliest input files will date from when the model was restarted. This was explained by Mr. Hakes, who was responsible for user support and technical enhancements of PPADS, in his October 2001 deposition. Hakes indicated, however, that although this was done with other projects, he did not know whether this was done with regard to the Hanfeng Project. Nevertheless, Foster Wheeler was prejudiced by relying on the representation that it was receiving *all* of the input files used.

B. Foster Wheeler claims that Black & Veatch knowingly misrepresented that it had produced to Foster Wheeler a CD which contained the *actual* creation/modification dates of the input files.

In a letter dated May 17, 2002, Foster Wheeler confirmed that counsel for Black & Veatch had indicated that Mr. Lindberg was now undertaking to determine whether Black & Veatch could produce "CD's containing the *actual* creation/modification dates of each of the input files" as required by the Court Order. In a letter dated May 20, 2002, Black & Veatch responded that:

> Contrary to your statement in your letter, you did not express any surprise during our conversation when I told you that I did not know whether Black & Veatch had the actual creation/modification dates for the input files. In addition, since nobody yet knows the answer to that question, any such surprise would have been inappropriate. Although Foster Wheeler hired an expert that speculated about whether such dates could be found, you never questioned any Black & Veatch witness about them and you presented no evidence that they still existed. I will keep you advised of Black & Veatch's efforts to locate them.

In a follow-up letter dated May 21, 2002, Black & Veatch advised that "this morning Black & Veatch located the information that you seek concerning the input files. They

---

8. July 29, 2002 Affidavit of Mark A. McFate, ¶ 6.

are putting it on a CD and you should have it this week." In a letter dated May 21, 2002, Foster Wheeler sought confirmation of its understanding that:

> Black & Veatch will produce this week "CD's containing the *actual* creation/modification dates of each of the input files" necessary to recreate the specific design calculations existing at the time of Black & Veatch's mill order.

Black & Veatch responded in a letter dated May 22, 2002 that "[y]ou are correct that Black & Veatch will provide the dates shown in its records as the actual creation/modification dates for the input files. I leave to you and your consultants whether those dates will enable you to recreate the design calculations that you describe."

In its May 29, 2002 letter, Black & Veatch stated that:

> Your May 28 letter also contends that the UNIX input files were not true copies of Black & Veatch's input files. This is inaccurate. Those files contained all of the information necessary to reproduce Black & Veatch's calculations, although the creation/modification dates reflected the dates of conversion to UNIX, rather than the dates on which they were first created in VAX.... [O]n October 30, 2001, I sent you all input files for the project, which were configured for the UNIX version of PPADS and can best be run on a UNIX machine. Those files contained creation dates, but the dates were not the ones you sought because they reflected the dates on which the VAX files were converted to UNIX, not the original creation dates. Yesterday, I sent you the same input files, but configured for the VAX version of PPADS. *These contain the original creation dates that you seek.* (Emphasis added).

Black & Veatch did not produce "CDs containing the *actual* creation/modification dates of each of the Input Files" as required by the Court Order. The "dates" produced by Black & Veatch are dates on which some, but not all, input files were "run" by Black & Veatch in its PPADS program which are different from the dates such input files were

actually "created/modified" before being run in the program.

Black & Veatch argues that the dates that were electronically stamped on the files before they were added to the PPADS database are unnecessary to determine whether the correct version of certain PPADS computer files were being used when recreating the calculations, because the REVIVED run files identify the correct version of the PPADS files to use. Black & Veatch argues that it cannot now provide Foster Wheeler with the electronically stamped dates, because reviving the PPADS database is a necessary step in running PPADS and producing the input files that Foster Wheeler requested, but the REVIVE command changes the dates electronically stamped on those files. Black & Veatch has no records from which the other set of dates can be obtained.

■ Black & Veatch claims that it should not be sanctioned for failure to produce the electronically stamped dates, because Foster Wheeler cannot show that it would be prejudiced if it could not recreate the preliminary calculations. It further claims that Foster Wheeler cannot show prejudice because the calculations are irrelevant to the parties' claims. However, the Court Order specifically found that Foster Wheeler's need for the materials requested outweighed the projected burden on Black & Veatch. In so finding, Judge Waxse noted that Black & Veatch did not dispute that the discovery is relevant. The Court finds that Foster Wheeler is entitled to its costs associated with its reliance on Black & Veatch's representations (beginning May 21, 2002) that it would produce or had produced a CD with the actual creation/modification dates.

C. Foster Wheeler claims that Black & Veatch misrepresented that the PPADS program did not "change during the time it was used on the Hanfeng project," when Black & Veatch knew that it had used a number of *versions* of its PPADS program on the Project. In a letter dated October 13, 2001, Black & Veatch advised Foster Wheeler that it was enclosing "*the* PPADS program" which Black & Veatch used on the project. (emphasis added). Black & Veatch's 30(b)(6) testi-

mony given on October 16–17, 2001, provides that:

Q. Did the PPADS program change during the time it was used on the Hanfeng project?

A. No.

Q. It was the same program from beginning to end of that project?

. . . .

A. I guess I want you to explain what you mean by same. I don't fully understand what you mean there.

Q. Well, what I'm trying to find out is whether or not there were any significant changes or revisions or modifications to the PPADS program during the time it was used on the Hanfeng project?

. . . .

A. No, there weren't.[9]

Black & Veatch's July 23, 2002 letter addressed Foster Wheeler's concerns about the serious omissions, inaccuracies, conflicts and discrepancies in the input files produced by Black & Veatch. In that letter, Black & Veatch informed Foster Wheeler for the first time, that Black & Veatch had used more than one version of its PPADS software program to make design calculations during the course of the Project. The letter states that "[t]he project database was 'dumped' and restarted when enhanced versions of PPADS were released . . . [t]he Run History will only include files executed in the enhanced database." Foster Wheeler was prejudiced by this misrepresentation.

**Sanctions:**

The Court finds that Black & Veatch failed to comply with the May 2, 2002 Court Order by misrepresenting to Foster Wheeler: (a) that Black & Veatch had produced a CD to Foster Wheeler which contained *all* of the input files which Black & Veatch had used to make design calculations for the Project; (b) that Black & Veatch had produced to Foster Wheeler a CD which contained the *actual* creation/modification dates of the input files;

and (c) that Black & Veatch's PPADS program did not change during the time it was used on the Project. Because the Court finds that Black & Veatch has not fully complied with the Court Order, the Court must determine the appropriate sanction. Case law in this Circuit makes it clear that a district judge may dismiss an action for discovery violations.[10] Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure provides that:

If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . . .

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

Because of the harshness of dismissal, due process requires that the discovery violation be predicated upon "willfulness, bad faith, or [some] fault of petitioner" rather than inability to comply. This circuit has provided a framework of factors that are to be considered prior to dismissal. The factors relevant to this inquiry, which are not to be used as a "rigid test," are: (1) the degree of actual prejudice to the defendants; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the Court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanctions.[11] The factors do not justify dismissal in this case.

In this case, the Court Order does not warn Black & Veatch that future failure to comply with the order may result in dismissal. However, Foster Wheeler was prejudiced by the misrepresentations. It spent time and resources attempting to recreate

---

**9.** October 16–17, 2001 Deposition of Daniel G. Hakes, p. 16, l. 11 to p. 17, l. 2.

**10.** *Archibeque v. Atchison, Topeka and Santa Fe Railway Co.,* 70 F.3d 1172, 1174 (10th Cir.1995)

(citing *Ehrenhaus v. Reynolds,* 965 F.2d 916, 920 (10th Cir.1992)).

**11.** *Id.* (citing *Ehrenhaus* at 921).

the interim design calculations based on the representations that it would be provided the necessary files to accomplish that task. Based on the actual prejudice to Foster Wheeler and the degree of Black & Veatch's culpability, the Court finds that a lesser sanction, namely an award of costs and fees, is more appropriate. Foster Wheeler should submit, within 10 days, a detailed itemization of its costs/fees that it alleges are a result of Black & Veatch's failure to cooperate by virtue of the misrepresentations set forth above. Black & Veatch shall have 5 days to object to Foster Wheeler's submission. The Court will review the submission and any objection filed, and determine an appropriate award.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Foster Wheeler Energy Corporation's Motion for Sanctions Against Plaintiff and for an Award of Costs and Attorneys' Fees to Defendant (Doc. 204) shall be GRANTED IN PART as set forth in this Order on Motion for Sanctions.

IT IS SO ORDERED.